**SECOND DIVISION**
**RICKMAN, P. J.,**
**GOBEIL and DAVIS, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**

**https://www.gaappeals.us/rules**

**November 3, 2025**

# In the Court of Appeals of Georgia

A25A1410. HOWARD et al. v. COFFEE REGIONAL MEDICAL
  CENTER, INC. et al.

DAVIS, Judge.

In this medical malpractice case, Angie Howard, as daughter and wrongful death beneficiary, appeals the trial court's grant of summary judgment in favor of Coffee Regional Medical Center, Inc., ("hospital"), Coffee County Hospitalist Physicians, LLC ("Physicians, LLC"), and Dr. Charlotte Coggins. On appeal, Howard argues that (1) the trial court erred by applying the Georgia Emergency Management Act[1] ("GEMA"), and Governor Kemp's 2020 COVID-related

---

[1] OCGA § 38-3-1 et seq.

executive orders[2] ("executive orders"); (2) the trial court erred to the extent it concluded the defendants were immune under the Georgia COVID-19 Pandemic Business Safety Act ("PBSA"), OCGA § 51-16-1, et seq.; and (3) the trial court erred by considering new arguments the defendants raised for the first time in their reply briefs to their summary judgment motion as well as by considering two untimely affidavits. For the reasons that follow, we reverse the grant of summary judgment.

> Summary judgment is appropriate when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. In reviewing the grant or denial of a motion for summary judgment, we apply a de novo standard of review, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant.

(Citation omitted.) *Steward v. Arandia*, 360 Ga. App. 356, 357 (861 SE2d 206) (2021).

So viewed, the evidence shows that in early 2020, David Lee Northcutt was an 81-year-old man who resided in an assisted living facility. In late March 2020, Northcutt presented to the hospital with what was ultimately determined to be a stroke. He was treated and returned to his facility.

Around 4:00PM in the afternoon on April 28, 2020, Northcutt presented to the

---

[2] The executive orders discussed here are in the record and available at https://gov.georgia.gov/executive-action/executive-orders/2020-executive-orders.

hospital for altered mental status. He was initially seen in the emergency room and was later transferred to a medical surgery observation unit around 6:00PM. In a note entered at 7:45PM, it was stated that Northcutt twice tested negative for COVID, but he "[could] go to the regular floor" for monitoring. Around 5:30AM the next morning, a nurse practitioner issued an order to admit Northcutt to the intensive care unit for closer monitoring of his condition. The order, however, was not fulfilled, and Northcutt was not moved to the intensive care unit.

Dr. Coggins was an employee of Physicians LLC who worked at the hospital. Northcutt was placed under her supervision around 8:00AM. According to Dr. Coggins, she was not aware that Northcutt had been ordered into the ICU or required critical urgent care, and so she did not prioritize seeing him on her rounds. Dr. Coggins first saw Northcutt around 11:00AM, where he was not responsive to painful stimuli, but his vital signs were normal. A nurse checked in on Northcutt around 1:30PM and found that he was not breathing. The nurse called a code, and Northcutt was declared dead minutes later.

An expert witness who reviewed Northcutt's medical records noted that Northcutt's blood pressure dropped significantly from the time of his admission to around 2:00AM, where it remained "dangerously low and inconsistent with life" for

the remainder of his stay. The expert witness also noted that Northcutt's temperature and oxygen levels fell significantly over the course of the evening. The expert witness testified that Northcutt received substandard care through the failure to receive ICU-level monitoring as ordered as well as the failure to receive sufficient measures to correct his low blood pressure, low fluid levels, and low oxygen.

In 2021, Howard sued the hospital, Physicians LLC, and Dr. Coggins (collectively, "defendants") for wrongful death. At the close of discovery, Dr. Coggins sought summary judgment, arguing that the lawsuit was foreclosed by PBSA. Several days later, the hospital moved for summary judgment under PBSA, GEMA, and Governor Kemp's COVID-related executive orders.

Howard responded to the summary judgment motions, arguing first that the PBSA is not retroactive and, accordingly, did not apply to acts predating the statute's enactment. Howard also contended GEMA and the executive orders protect only emergency management "workers" — that is, it only applied to individual persons, not healthcare institutions or medical facilities. Howard further contended that GEMA did not apply because Northcutt's death was not caused by COVID and that there was evidence that the ongoing pandemic did not impact the defendants' ability to provide him with the requisite level of care.

Four days before the scheduled oral argument, Dr. Coggins replied, styling her brief as "Defendants Charlotte Coggins, M.D. *and* Coffee County Hospitalist Physicians, LLC's Reply in Support of their Motion for Summary Judgment." (emphasis supplied).[3] In the reply brief, Dr. Coggins asserted for the first time that she was entitled to immunity under GEMA. Thereafter, on July 18, 2024, the hospital filed its reply, which restated the hospital's initial arguments. In a footnote, the hospital contended for the first time that provisions of the federal Public Readiness and Emergency Preparedness Act ("PREP Act"), 42 U. S. C. A. § 247d-6 "provide[d] further grounds for immunity from [Howard's] claims, though for the sake of judicial economy it is not expounding on same as the bases set forth in its Motion for Summary Judgment and supporting Briefs are sufficient to establish immunity and dismissal." The hospital also attached two new affidavits from nurses who had provided Northcutt care.[4] The same day that the hospital filed its reply,

---

[3] Dr. Coggins filed a motion to correct a scrivener's error wherein her attorney asserted he inadvertently left off from the initial motion any reference to Physicians LLC (who was represented by another law firm). The trial court accepted counsel's assertion and considered the motion as if it had been brought by both parties from the outset.

[4] The two affidavits consisted of brief statements from the nurses that each was actively providing care for COVID patients "utilizing requisite personal protective equipment as available" during the same time that they were providing care for Northcutt.

Howard filed a motion to strike the two late affidavits as well as the defendants' new arguments raised for the first time in their reply briefs.

Following a hearing on July 19, 2024, the trial court granted summary judgment on September 3, 2024, to Dr. Coggins and Physicians, LLC, concluding that they were entitled to the protections of GEMA and the COVID executive orders. On September 11, 2024, the trial court also granted the hospital summary judgment "based upon the [c]ourt's review of . . . the entire record in th[e] case[.]" The same day, the trial court also denied Howard's motion to strike the late-filed evidence and arguments. This appeal followed.

1. We first address Howard's argument that the defendants are not immune under GEMA and Governor Kemp's related executive orders concerning the COVID pandemic. We agree that GEMA does not apply to Howard's claims against the hospital and Physicians LLC as a matter of law, and we conclude that genuine issues of material fact remain as to whether GEMA applies to Dr. Coggins.

(a) *The Hospital and Physicians LLC.* GEMA, in relevant part, provides that

[n]either the state nor any political subdivision of the state nor, except in cases of willful misconduct, gross negligence, or bad faith, the employees, agents, or representatives of the state or any political subdivision thereof, *nor any volunteer or auxiliary emergency management worker* or member of any agency *engaged in any emergency management*

*activity* complying with or reasonably attempting to comply with Articles 1 through 3 of this chapter . . . shall be liable for the death of or the injury to person or for damage to property *as a result of any such activity*.

OCGA § 38-3-35 (b) (emphasis supplied). The hospital claims immunity under this provision, arguing it fits the definition of "auxiliary emergency management worker." A straightforward reading of the text shows otherwise.

When interpreting a statute,

we must presume that the General Assembly meant what it said and said what it meant. To that end, we must afford the statutory text its plain and ordinary meaning, we must view the statutory text in the context in which it appears, and we must read the statutory text in its most natural and reasonable way, as an ordinary speaker of the English language would. Consequently, courts sometimes refer to the rules of English grammar, inasmuch as those rules are the guideposts by which ordinary speakers of the English language commonly structure their words, and the legislature is presumed to know . . . the rules of grammar.

(Citations and punctuation omitted.) *Deal v. Coleman*, 294 Ga. 170, 173 (1) (a) (751 SE2d 337) (2013). We apply similar rules when interpreting executive orders. *Resurgens, LLC v. Ervin*, 369 Ga. App. 675, 679 (1) (894 SE2d 408) (2023). Applying these interpretive tools to section (b) of OCGA § 38-3-35, we conclude the statute does not cover entities like the hospital.

7

The statute limits liability for "the employees, agents, or representatives of the *state or any political subdivision* thereof, [and] any volunteer or *auxiliary emergency management worker or member of any agency* engaged in any emergency management activity[.]" (Emphasis supplied.) OCGA § 38-3-35 (b). Since the hospital admits that it is not an employee, agent, or representative of the "state or any public subdivision thereof," it claims to be an "auxiliary emergency management worker." Although the statute does not define the term, see OCGA § 38-3-3, the dictionary defines "worker" as "one that works especially at manual or industrial labor or with a particular material."[5] We conclude that this word is not ambiguous because an ordinary speaker of English would not use the term "worker" to include a hospital, corporation, or other business-like entity such as the hospital or Physicians LLC.

Nevertheless, the hospital attempts to buttress its argument by drawing on Governor Kemp's April 14, 2020 executive order, but that order only reinforces the idea that GEMA only applies to individuals. The order declared that all "employees, staff, and contractors of healthcare institutions and medical facilities shall be considered auxiliary emergency management workers pursuant to Code Section 38-3-35." The immunities granted under OCGA § 38-3-35, however, run to

---

[5] See Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/worker (last updated Oct. 25, 2025).

8

"employees, staff, and contractors" *of* certain healthcare entities, not the healthcare institutions or medical facilities themselves. This is the most reasonable way to read the definition of "auxiliary emergency management workers" when transposed into the statutory text. Therefore, contrary to the hospital's contention, OCGA § 38-3-35 does not grant it immunity; only "employees, staff, and contractors" are beneficiaries of the immunity provision found in OCGA § 38-3-35. Compare GEMA with OCGA § 51-16-2 (a) (providing immunity to a "healthcare facility," "healthcare provider," or "entity").

Finally, the hospital maintains that, because its nurses constituted "auxiliary emergency management workers" engaged in emergency actions, it is also necessarily immune vicariously. However, immunities are unique: "unlike privileges, [immunities] are not delegable and are available as a defense only to persons who have them. . . . The fact that the agent has an immunity from liability does not bar a civil action against the principal." (Citation and punctuation omitted) *Gilbert v. Richardson*, 264 Ga. 744, 754 (7) (452 SE2d 476) (1994); see also *Stephens v. Conyers Apostolic Church*, 243 Ga. App. 170, 171 (1) (532 SE2d 728) (2000) ("[P]rivate employers can be liable for the negligent acts of their employees, despite the employees' immunity from liability.") (citation omitted); *Krachman v. Ridgeview Institute, Inc.*, 301 Ga. App.

9

361, 364 (1) (687 SE2d 627) (2009) (stating, after interpreting OCGA § 37-3-4, that "[t]he plain language of the statute extends immunity only to designated individuals and does not evidence a legislative intent to confer immunity on hospitals or other mental health facilities. . . .") (citation omitted). Thus, despite any immunities that may protect the hospital's workers, the hospital itself is not protected under the plain language of OCGA § 38-3-35.

(b) *Dr. Coggins* As a contractor of a healthcare institution providing services and treating COVID patients, "Dr. [Coggins] indeed may have been designated an auxiliary emergency management worker under OCGA § 38-3-35." *Resurgens, LLC*, supra, 369 Ga. App. at 679 (1). However, to be immune, Dr. Coggins must show that she was "engaged in any emergency management activity" and that Northcutt's death and injury was "as a result of any such activity." OCGA § 38-3-35 (b). Viewing the conflicting evidence in the record in Howard's favor, we conclude that genuine issues of material fact remain as to whether that was the case.

The record in this case shows that, soon after Northcutt presented to the hospital, it was noted that Northcutt twice tested negative for COVID, and he "[could] go to the regular floor" for monitoring. After Northcutt spent the night at the hospital, his blood pressure, body temperature, and oxygen levels dropped

significantly from the time of his admission, with his blood pressure in particular being "dangerously low." Early the next morning, a nurse practitioner ordered that he be placed in the ICU. The order, however, was not fulfilled, and Northcutt was not moved to the intensive care unit or provided with ICU-level care.

Although the defendants point to evidence that Northcutt was not moved to ICU because no beds were available, the hospital's records noted 19 patients were placed in 14 different ICU rooms from April 27 through 29 when there were 19 different ICU rooms. Under the hospital's policy, if a patient was ordered to the ICU but was unable to be placed there, the patient was still required to receive ICU-level care to the extent possible, including continuous monitoring, a full work-up, and resuscitative measures. Dr. Coggins testified that she did not provide this level of care because she was not made aware that Northcutt was in any critical level of need, not because of the pandemic.

From this evidence, a reasonable factfinder could potentially conclude that Northcutt's death was not caused by COVID and that the defendants' efforts to respond to the ongoing health emergency did not meaningfully affect their ability to provide the normal standard of care. There is therefore evidence in the record from which a reasonable factfinder could conclude that Northcutt's death was not "as a

result of" any "emergency management activities" by the defendants to respond to the ongoing COVID emergency. See *Resurgens, LLC*, 369 Ga. App. at 680-682 (1) (rejecting argument that GEMA foreclosed a medical malpractice claim when there was no "compelling argument" that the performance of a surgery unrelated to the COVID emergency was an "emergency management activity"). Accordingly, we reverse the trial court's grant of summary judgment on this issue.

2. Howard also argues that the trial court erred to the extent it concluded that the defendants were entitled to summary judgment under the PBSA. We agree.

On August 5, 2020,the General Assembly enacted PBSA,[6] which reads in relevant part:

> No healthcare facility, healthcare provider, entity, or individual shall be held liable for damages in an action involving a COVID-19 liability claim against such healthcare facility, healthcare provider, entity, or individual, unless the claimant proves that the actions of the healthcare facility, healthcare provider, entity, or individual showed gross negligence, willful and wanton misconduct, reckless infliction of harm, or intentional infliction of harm.

OCGA § 51-16-2 (a). Based on this statute, each defendant claimed it was entitled to summary judgment. We conclude otherwise.

---

[6] See Ga. L. 2020, p. 798, § 3.

12

In this case, Howard sued for conduct that occurred in April 2020 while the General Assembly enacted PBSA in August 2020. See Ga. L. 2020, p. 798, § 3. Thus, the alleged malpractice predated the passage of the statute, and consequently, as this Court previously observed, litigants "cannot rely on this subsequently passed, non-retroactive act." *Resurgens,* 369 Ga. App. at 682 n.8.

> The presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine older than our Republic. For that reason, courts usually insist upon some clear indication in the statutory text that a statute is to be applied retroactively before so applying it.

(Citations and punctuation omitted.) *Deal,* 294 Ga. at 174-75 (1) (b). That "clear indication" does not appear in the PBSA or its implementing legislation. See Ga. L. 2020, p. 798, § 3. Because there is nothing in the text indicating the statute applies retroactively, we cannot interpret it as having retroactive effect. See OCGA § 1-3-5 (stating "[l]aws prescribe only for the future" and ordinarily have no retrospective operation); see also *Patel v. State of Ga.*, 375 Ga. App. 1, 3 (2) (914 SE2d 412) (2025) (declining to retroactively apply an amendment because the "text does not indicate that [it] should be applied retroactively."); *Biddle v. Moore*, 87 Ga. App. 524, 525 (74 SE2d 552) (1953) ("Where the legislative intent is not expressly stated, it is to be

presumed that the intent was that the legislation be prospective in effect.").

3. Howard also claims that the trial court erred by granting summary judgment based on the arguments the defendants introduced for the first time in their reply briefs as well as the hospital's two late-filed affidavits.

As an initial matter, we conclude after a careful reading of the hospital's reply brief to its summary judgment motion that its brief, isolated reference to the PREP Act was not sufficient to actually raise the issue as a basis to grant summary judgment. In particular, the hospital stated that it was not "expounding on" any claim under the PREP Act because it believed that the arguments that it already raised were sufficient.[7] Although we "liberally and reasonably" construe pleadings to achieve substantial justice, (Citation and punctuation omitted.) *McLeod v. Costco Wholesale Corp.*, 369 SE2d 717, 722 (894 SE2d 442) (2023), we cannot conclude that this non-committal statement contained in a footnote sufficiently raised the issue. And although the trial court did not specify the basis for its grant of summary judgment to the hospital, because we conclude that the hospital did not properly raise the PREP Act as an issue,

---

[7] We note that the hospital did not present any argument at the summary judgment hearing concerning the PREP Act, and the hospital similarly does not present any argument on appeal concerning the PREP Act.

we cannot conclude that the trial court granted summary judgment on that basis.[8] Thus, we do not reach the issue of whether it was proper for the hospital to raise the issue for the first time in its reply brief.

Finally, because we concluded above in Division (1) (b) that summary judgment was not appropriate on Dr. Coggins' claim that GEMA and Governor Kemp's COVID orders afforded her immunity, we do not reach the issue of whether it was reversible error for the trial court to consider that argument despite the fact that Dr. Coggins raised it for the first time in her reply brief to her summary judgment motion. Similarly, because we have already concluded on the merits that summary judgment to the hospital was not proper, we also have no cause to address Howard's claim that the trial court erred by failing to strike the hospital's two affidavits that were filed the day before the summary judgment hearing.

Accordingly, for the reasons stated above, we reverse the trial court's summary judgment order.

*Judgment reversed. Rickman, P. J., and Gobeil, J., concur.*

---

[8] For this reason, we also do not address Howard's argument that the hospital was not immune under the PREP Act.